UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KIERRA WILLIAMSON, PRINCETON WILLIAMSON, and MICHAEL WILLIAMSON, | )<br>)<br>) Case No. 14-cv-6397 |
| Plaintiffs, | ) Judge Sharon Johnson Coleman |
| v. | ) |
| CHICAGO POLICE OFFICER WILFREDO ORTIZ, #9748, and THE CITY OF CHICAGO, a municipal corporation, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

The plaintiffs, Kierra Williamson, Princeton Williamson, and Michael Williamson, brought this action against Chicago Police Officer Wilfredo Ortiz and the City of Chicago, alleging that Officer Ortiz used excessive force against the defendants. Following a lengthy trial, the jury found in favor of the plaintiffs, awarding Kierra Williamson $750,000 in compensatory damages and $250,000 in punitive damages, Princeton Williamson $1,500,000 in compensatory damages and $150,000 in punitive damages, and Michael Williamson $2,000,000 in compensatory damages and $100,000 in punitive damages. The defendants have now filed a combined post-trial motion renewing their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(B), seeking a new trial under Federal Rule of Civil Procedure 59(A), and seeking the remittitur of damages under Federal Rule of Civil Procedure 59(E). For the reasons set forth herein, that motion [231] is denied.

**Discussion**

*Renewed Motion for Judgment as a Matter of Law*

The defendants first renew their motion for judgment as a matter of law. Under Rule 50, a court should grant judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue. *Alexander v. Mount Sinai Hosp. Med. Ctr.*, 484 F.3d 889, 902 (7th Cir. 2007). The defendants contend that judgment as a matter of law is warranted because no reasonable jury could find that Officer Ortiz intentionally shot Kierra Williamson and because no reasonable jury would conclude that qualified immunity should not apply to Officer Ortiz's conduct. The defendants' renewed motion does not put forward any argument which was not before the Court when the defendants initially moved for a directed verdict at the close of the plaintiffs' case, and the Court therefore denies it for the reasons previously stated in open court.

*Motion for a New Trial*

The defendants next contend that a new trial is warranted under Federal Rule of Civil Procedure 59(a). Rule 59(a) provides for a new trial when there is a significant chance that evidentiary errors at trial affected the jury's verdict. *Barber v. City of Chicago*, 725 F.3d 702, 715 (7th Cir. 2013). A new trial is warranted when the cumulative effect of the identified errors deprives a litigant of a fair trial or when the verdict which results is contrary to the manifest weight of the evidence. *Lowe v. Consol. Freightways of Del., Inc.*, 177 F.3d 640, 641 (7th Cir. 1999).

The defendants first assert that a new trial is warranted because the verdict on Kierra Williamson's excessive force claim is contrary to the manifest weight of the evidence. This argument echoes the defendants Rule 50 argument that Officer Ortiz could not see Kierra Williamson, and therefore could not have intended to use force against her. As this Court has repeatedly held, however, there was evidence before the jury capable of establishing that Kierra

Williamson was in the kitchen, that the door to the kitchen was open, that Kierra Williamson was visible to Officer Ortiz, and that Officer Ortiz deliberately fired into the kitchen, striking Kierra Williamson. Accordingly, the manifest weight of the evidence is not contrary to the jury's verdict with respect to Kierra Williamson's claims.

The defendants contend that this Court erred when it allowed Roger Clark to provide expert testimony regarding Officer Ortiz's conduct. Roger Clark testified, in pertinent part, that Officer Ortiz committed a tactical error when he ran around the corner of the house, leaving a place of cover and exposing himself to a potentially armed assailant. Clark also testified, without objection from the defendants, that he took issue with Officer Ortiz's statement that he had no cover, because

> officers are trained that they are responsible for their actions that will
> – that result in a use of lethal force. And an officer deliberately
> disregarding this fundamental rule cannot be excused in the training
> and especially when we did the scenario role play when we trained,
> that, well, I was out of cover and I had no choice. That is not an
> excuse that's valid when you use lethal force in particular.

The defendants' assertion that this testimony is inconsistent with Seventh Circuit law is incorrect. Within the Seventh Circuit, it is recognized that police officers are not required to use all practical alternatives to avoid a situation where deadly force is justified. *Plakas v. Drinski*, 19 F.3d 1143, 1148 (7th Cir. 1994). Clark's testimony, however, did not suggest that Ortiz's use of deadly force was not justified because alternatives were available. Instead, it established that Officer Ortiz acted in a manner which was inconsistent with his training and with sound judgment, providing circumstantial evidence concerning his state of mind at the time of subsequent events. This is further demonstrated by the plaintiffs' subsequent questioning about the adequacy of Ortiz's communication with his fellow officers, which highlighted the potentially impulsive nature of his conduct. This Court, moreover, issued a version of Seventh Circuit pattern jury instruction 7.10, expressly instructed that "an officer is not required to use all practicable alternatives to avoid a

3

situation where deadly force is justified." Thus, even if Clark's testimony was improper, it would not have impacted the jury's deliberations.

The defendants next assert that this Court erred by permitting Roger Clark to provide undisclosed opinion testimony. Clark, at multiple points in his expert report, stated as a matter of underlying fact that Ortiz's bullets had penetrated the porch railings, the screen door, the siding of the house, the garage of the home next door, and the interior walls and cabinets of the residence. At trial, the plaintiffs asked Clark whether the bullets had passed through the screen door, and the defendants objected, asserting that this was improper opinion evidence. Although the Court agreed that it had not been disclosed that Clark would be offering ballistics testimony, the Court noted that his interpretation of the evidence had been disclosed in his report as factual predicate and that the defendants did not previously dispute that factual interpretation. Clark, moreover, informed the Court that he had disclosed the reasoning underlying his opinion regarding the screen door during his deposition, and defense counsel failed to dispute the existence of that disclosure. The Court thus concluded that the plaintiffs' failure to disclose that Clark would offer an expert opinion that bullets passed through the screen door was harmless because the defendants were on notice that Clark interpreted the evidence in that manner and had the opportunity, which they apparently availed themselves of, to examine him on that topic. *See Gicla v. United States*, 572 F.3d 407, 410 (7th Cir. 2009) (recognizing that untimely-disclosed expert testimony need not be excluded if the failure was substantially justified or harmless). The Court also doubts that Clark's testimony substantially impacted the jury's determination given the ample testimony and physical evidence demonstrating the damage caused by Officer Ortiz's bullets, which permitted the jury to independently assess the credibility of Clark's assessment.

The defendants also assert that this Court erred by barring them from cross-examining Princeton Williamson regarding his prior gunshot wounds. The defendants contend that these prior

wounds were relevant to Princeton's testimony regarding the scarring from his injuries and the embarrassment that they caused. They also assert that Princeton denied having been previously hospitalized during his deposition, and that the evidence of his prior wounds was therefore impeachment evidence. At trial, Princeton showed the scars on his torso to the jury. He also testified, at some length, about the embarrassment resulting from the scars left by the wound to his groin. Although Princeton admitted to having other unrelated scars on his back, the Court did not permit inquiry into whether those scars resulted from gunshots. The defendants now claim that they were unable to challenge Princeton's testimony regarding his injuries. This Court, however, gave the defendants the opportunity of having Princeton Williamson show all of his scars to the jury. The defendants declined to avail themselves of this opportunity. The defendants similarly failed to impeach Princeton Williamson with his prior hospitalization, despite having had the opportunity to do so. The only evidence that the Court kept out was the fact that Princeton Williamson's other scars and past hospitalization had been the result of gunshot wounds. The fact that Princeton Williamson had been shot previously had no probative value and was highly prejudicial due to the imputation of past criminality that prior gunshot injuries would have carried. Princeton's prior gunshot wounds, as an irrelevant collateral matter, therefore could not properly have been used as impeachment evidence. *Taylor v. Nat'l R.R. Passenger Corp.*, 920 F.2d 1372, 1375 (7th Cir. 1990).

The defendants next contend that this Court erred by barring evidence of Michael Williamson's criminal history, which the defendants claim was necessary to rebut the plaintiffs' characterization of Michael as an "eight year naval veteran without any substantial criminal background" during the questioning of Roger Clark about his own prior use of force. The defendants objected to that question, however, and the Court sustained that objection. It is debatable, moreover, whether the statement that Michael did not have a "substantial criminal

5

background" was misleading given that the only criminal history that the defendants now point to was a 2009 arrest for assault and battery. Accordingly, the Court is unconvinced that counsel's question "opened the door" to the curative admission of the 2009 arrest. *United States v. Lerch*, 996 F.2d 158, 162 (7th Cir. 1993). The issue of Michael Williamson's criminal history again came up during the closing rebuttal, with plaintiffs' counsel incorrectly stating that Michael had "no criminal background." By that time, however, the window in which evidence of Michael Williamson's past arrest could be presented to the jury had already closed.

The defendants next contend that they were improperly prevented from impeaching Michael Williamson's assessment of his injuries using untimely-disclosed videos obtained from the internet. Although Michael Williamson testified that the shooting had caused him chronic pain and limited his ability to lift heavy objects, the defendants came across Instagram videos from September 2017 showing Michael Williamson lifting weights (potentially as part of his physical therapy).

The defendants claim that they discovered this evidence the night before they sought to present it, and this Court has no reason to question the accuracy of that statement. The defendants, however, failed to disclose the video's intended use as evidence until its attempted introduction in the middle of trial, despite this Court's explicit show-and-tell requirements which counsel was repeatedly made aware of and multiple opportunities to raise the issue of this newly-discovered evidence outside the presence of the jury. The Court stands by its prior determination, as stated on the record, that counsel's conduct in attempting to present this evidence in clear contravention of this Court's stated trial procedures warranted its exclusion.

The defendants also argue that the Court erred by excluding the police radio transmissions that occurred prior to and after the incident in question. The defendants contend that the transmissions prior to the shooting were relevant to explaining Officer Ortiz's state of mind and the reasonableness of his actions. As the Court previously held when it excluded that evidence,

6

however, the tape in question was unclear, confusing, and prejudicial to the plaintiffs. The tape was also of minimal relevance given that it was cumulative of other evidence establishing the circumstances which brought Ortiz to the location of the incident. The radio transmissions after the shooting were equally irrelevant, given that none of them were made by Officer Ortiz. Those transmissions, moreover, were cumulative of facts already in evidence.

The defendants contend that they should have been permitted to argue that the scientific standard applied to gunshot residue testing supported their case. The plaintiffs' forensic expert, Scott Rochowitcz, testified that Michael Williamson's right cuff tested negative for gunshot residue. On cross-examination, Rochowitcz specified that this finding was based on the Illinois State Police's requirement that a positive finding of gunshot residue be based on at least three or more tri-component particles, and that other labs require fewer tri-component particles in order to make a positive gunshot residue determination. During closing arguments, defense counsel attempted to argue that the scientific community in the United States agrees that two tri-component particles are sufficient to support a positive gunshot residue finding. The plaintiffs objected that this fact was not in evidence, and the Court sustained the objection. The defendants contend that this Court's ruling was erroneous because their argument was amply supported by Rochowitcz's testimony. After reviewing that testimony, it is clear that Rochowitcz never testified as to whether two particles was sufficient. Instead, he testified only as to what the practice of the Illinois State Police was and what the practice of other agencies was, without opining on the sufficiency of either standard employed. In any event, the Court's ruling on this point did not prejudice the defendants because, at multiple other points in their closing arguments, they asserted without objection that Michael Williamson had gunshot residue on his sleeve.

The defendants next assert that Officer Ortiz's cross-examination was improperly tainted by "whispers" heard on the audiotape of Officer Ortiz's testimony before the Independent Police

Review Authority. The Court, over the defendants objections, permitted the playing of portions of the audio tape on which these unidentified whispers were audible, but barred the plaintiffs from specifically inquiring into the whispers or arguing that they demonstrated that Officer Ortiz was being coached. Over objection, the Court did permit a general question as to whether Officer Ortiz was coached, which did not specifically implicate the whispers in question. The Court remains convinced that the introduction of the full portions of relevant audio, including the whispers, was appropriate and necessary in order to allow the jury to fairly assess the weight to be given to Officer Ortiz's testimony. Although the plaintiffs, during closing arguments, did assert that these whispers might have been an attempt to coach Officer Ortiz, the defendants did not object to that argument and this Court therefore was not called on to rule on its propriety.

The defendants next contend that it was error to permit the plaintiffs to recall Detective Johnson (via the reading of prior testimony) to impeach Officer Ortiz on collateral matters. The matters in question, however, were not collateral. Rather, they concerned Michael Williamson's conduct when Officer Ortiz encountered him and therefore were directly relevant to the issues before the jury. Accordingly, the Court concludes that it was not error to permit the plaintiffs to elicit this impeachment evidence.

Finally, the defendants argue that the cumulative effect of all of the aforementioned errors was so severe as to render their trial fundamentally unfair. As previously set forth, the defendants' claims of trial error are without merit, and therefore the defendants have failed to demonstrate that cumulative error occurred. Accordingly, there is no basis for granting the defendants' motion for a new trial.

*Remittitur of the Damages Awards*

The defendants move this Court for a remittitur of the compensatory damages awarded in this case because they bear no rational connection to the evidence and are inconsistent with the

verdicts in similar cases. In deciding whether a damages award is excessive, this Court considers "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011) (citation omitted). A monstrously excessive verdict is one that is "a product of passion and prejudice," an analysis that the Seventh Circuit has recognized overlaps with the underlying question of whether the jury's verdict was irrational. *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). In deference to the jury's role as the trier of fact, this Court reviews the record as a whole and takes the evidence in the light most favorable to the jury's verdict. *Id.*

The jury in this case awarded Kierra Williamson $750,000 in compensatory damages, Princeton Williamson $1,500,000 in compensatory damages, and Michael Williamson $2,000,000 in compensatory damages. The defendants contend that these compensatory damages awards are excessive because the plaintiffs "fully recovered from their injuries within months," "work in physically demanding jobs and lead active lives." This argument disregards evidence presented at trial which, when taken in the light favorable to the jury's verdict, clearly stablishes the plaintiffs' injuries.

Michael Williamson received $2,000,000 in compensatory damages. The evidence at trial, taken in his favor, established that he was shot in his chest, hip, armpit, buttocks, and back. As a result of his injuries, he required a bone graft and surgical bone repairs, had to use a colostomy bag for a year, suffered from muscle atrophy, sustained permanent nerve damage and other physical impairments, and required extensive physical therapy. Additionally, the incident ended his career in the Navy and caused him to incur over $240,000 in medical expenses.

9

Princeton Williamson received $1,500,000 in compensatory damages. Princeton Williamson was shot multiple times in the stomach, bladder, and groin, resulting in the severance of his gonadal artery, damage to his left iliac artery, and a gaping stomach wound. Princeton testified to considerable pain during his hospitalization and was initially unable to walk. He testified that he no longer can work like he used to and can now only engage in light construction activities as a result of the pain and numbness that his leg experiences when he stands for a long period. Princeton also testified as to the disfiguring scars on his stomach and genitals, and the severe impact that the latter scars have had on his romantic relationships. Finally, he established that the costs of his medical care totaled over $220,000.

Kierra Williamson received $750,000 in compensatory damages. Kierra was shot in her abdomen, damaging her large intestine and hip bone, resulting in the removal of part of her colon, and leaving her with an open stomach wound that left her bedridden for a month. She testified that, as a result of her injuries, she suffers from nerve damage that causes her left leg to become tired and weak. Although Kierra Williamson subsequently became pregnant and gave birth, there is no evidence before this Court to establish what impact her injuries had on her pregnancy, and this Court therefore declines to draw any inferences about her medical condition from that fact.

All three plaintiffs also testified as to the emotional distress that they experienced as a result of the incident and their resulting injuries. Such testimony is adequate to support an award for nonpecuniary loss. *Tullis v. Townley Eng'g & Mfg. Co., Inc.*, 243 F.3d 1058, 1068 (7th Cir. 2001). The evidence presented at trial, taken in the light most favorable to the verdict, shows that the defendants' argument that the plaintiffs fully recovered from their injuries within months is unsupported and that the compensatory damages awarded were rationally related to the nature and extent of the injuries that the plaintiffs suffered.

The defendants further argue that the compensatory damages awarded in this case far exceed the compensatory damages awarded in other police shooting cases. The appropriate comparator here, however, is other police shooting cases involving similar injuries to those here. The defendants have not established that any of the cases that they rely on involve such injuries. To the contrary, this Court's review of those cases suggests that many of them are distinguishable based either on the extent of injury involved or the criminal culpability of the injured party.[1] "Individual cases can differ from each other enormously in terms of witness credibility, the quality of the presentation, the nature and extent of the injuries, the vulnerability of the victim, the reactions of jurors to the particular circumstances, and hosts of other variables." *Ibaenez v. Velasco*, No. 96 C 5990, 2002 WL 731778, at *11 (N.D. Ill. Apr. 25, 2002) (Grady, J.). The defendants cursory analysis of the cases that they rely on fails to establish that those cases are comparable to this situation now before this Court. The Court, moreover, notes that within this district larger compensatory damage awards have been awarded in cases involving less severe circumstances and that the awards here, although substantial, are not beyond the realm of reason. *See, e.g., Id.* (declining to alter a $2,500,000 compensatory damage award to a plaintiff who was beaten by correctional officers but did not sustain permanent physical injury); *Frazier v. Norfolk & Western Ry. Co.*, 996 F.2d 922, 925 (7th Cir. 1993) (affirming the award of $2,300,000 to a plaintiff who suffered a back injury while on the job).

The defendants next ask this Court to strike the punitive damages award in its entirety. The defendants contend that this relief is warranted because there is "no evidence" that Officer Ortiz was motivated by evil intent or callous indifference to the plaintiffs' federally protected rights. Surprisingly, the defendants do not argue that Officer Ortiz's actions were self-defense necessitated by having a gun pointed at him. Instead, they appear to argue that his actions do not warrant

---

[1] The defendants, for instance, make much of the recent $78,500 compensatory damages verdict in *Banks v. Bay*, 13-cv-5321 (N.D. Ill. July 21, 2017). Although the plaintiff in that case was shot by police, he was shot while in possession of a firearm and required only one night's hospitalization. His damages are therefore starkly different than those of the plaintiffs here, who required substantial hospitalization and significant periods of rehabilitation.

11

punitive damages because of the rapid course of events and because he was reacting to having heard gunfire from the porch.

Taking the evidence in the plaintiffs' favor, however, a reasonable jury could have reached the conclusion that Officer Ortiz, having run around a corner chasing the sound of gunshots and come face to face with a crowd of potentially-armed individuals, fired indiscriminately into that crowd. The defendants' arguments here reflect this possibility, characterizing Officer Ortiz as firing his gun "at *the porch* within seconds of hearing someone firing a semi-automatic gun." (Emphasis added). Officer Ortiz, moreover, admitted that he fired while moving and without using his gun's sights, conduct calling into question whether he had identified and was aiming at a specific individual. Accordingly, there is evidence before this Court from which a jury could infer that Officer Ortiz, having exposed himself to multiple individuals who he perceived as threats, fired indiscriminately at those individuals until the perceived threat was eliminated. Such conduct would clearly constitute callous indifference to the plaintiffs' rights.

The defendants alternatively ask that the punitive damages award be remitted. In assessing the propriety of punitive damages awards, the Supreme Court directs that court's consider (1) the reprehensibility of the defendant's conduct; (2) the relationship between the amount of the punitive damages award and the harm or potential harm suffered by the plaintiff; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

The Court first turns to the relationship between the punitive damages awards and the harm suffered by the plaintiffs. It is well established that punitive damages, although they may exceed compensatory damage awards, must have some "reasonable relationship" to the harm that the plaintiff has suffered. Here, Kierra Williamson was awarded $250,000 in punitive damages and $750,000 in compensatory damages. Princeton Williamson was awarded $150,000 in punitive

damages and $1,500,000 in compensatory damages. Finally, Michael Williamson was awarded $100,000 in punitive damages and $2,000,000 in compensatory damages. Kierra Williamson's punitive damages award is a third of her compensatory damages, and the remaining plaintiffs' punitive damages awards are even smaller in proportion to the jury's assessment of the harm that they suffered. The defendants appear to concede the proportionality of the punitive damages awards here, arguing only that the punitive damages are excessive if this Court credits their arguments challenging compensatory damages, which this Court does not.

The defendants further contend that the punitive damages in this case are excessive in light of those awarded in similar cases. The cases that the defendants primarily rely on, however, are not similar to the present case. *Guajardo v. County of Cook*, No. 88 C 10964, 1990 WL 43570 (N.D. Ill. Mar. 29, 1990) (Kocoras, J.) for instance, was decided twenty-eight years ago on a default judgment. In light of the $100,000 compensatory damages award, the Court rejected the plaintiffs request for $500,000 in punitive damages and instead awarded $25,000. In *Waits v. City of Chicago*, No. 01 C 4010, 2003 WL 21310277 (N.D. Ill. June 6, 2003) (Hibbler, J), the Court rejected a punitive damages award of $2,000,000 and instead reduced it to $45,000 based on its disproportionate relation to the compensatory damages award of $15,000. Here, the plaintiffs suffered substantial injuries and the nature of Officer Ortiz's conduct is distinguishable from those cases that the defendants rely on. This case, moreover, cannot realistically be compared to those decided twenty or thirty years prior.[2]

The degree of reprehensibility is the most significant factor in assessing the propriety of a punitive damages award. *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The reprehensibility of a defendant's conduct is assessed based on

---

[2] The assessment of punitive damages turns, in part, on the reprehensibility of the conduct in question, an assessment based on the nature and severity of the harm, the vulnerability of the victim, and the actor's intent. Recently, increasing attention has been paid to the number of police shootings that involve unarmed people of color. There has also been growing recognition of the impact of racial bias in policing—especially when it comes to the use of force—and the lasting harm that inequitable police conduct can have on communities of color. In light of these changes, it is not unreasonable to expect that a jury sitting today would find the conduct involved herein objectively more reprehensible and more contemptuous than a jury sitting thirty years ago and would therefore confer a greater punitive damages award.

13

(1) whether the harm was physical or economic in nature; (2) whether the conduct evinced an indifference to or reckless disregard for the health or safety of others; (3) whether the target of the conduct was especially vulnerable; (4) whether the conduct involved repeated actions; and (5) whether the harm was the result of malice, trickery, or deceit, or mere accident. *Id.*

Here, the defendants contend that Officer Ortiz's conduct was not reprehensible because he was responding to prior gunfire, saw a gun pointed at him, and responded appropriately. This argument, however, is based entirely around the defendants version of events, which the jury in this case clearly rejected. Taking the evidence in favor of the jury's verdict, the facts suggest that Officer Ortiz recklessly chased after the sound of gunshots on New Year's Eve without cover or reinforcements. Rounding a corner, he was confronted with a porch of black revelers, one of whom may have thrown a gun to the ground. None of these revelers took any action to threaten Officer Ortiz. Yet Officer Ortiz, faced with no imminent threat, fired eleven shots into the crowd on the porch and in the house. Officer Ortiz admitted that he did not stop to aim until after he fired these shots. On these facts, a reasonable jury could easily have concluded that Officer Ortiz acted with either malice or reckless indifference towards the plaintiffs' wellbeing.

The severity of these facts is only compounded by Officer Ortiz' callous conduct at trial. Officer Ortiz repeatedly refused to admit that he shot Princeton and Kierra Williamson despite the obviousness of that fact, and went so far as to claim that "no one's ever told me that I shot three people. All I know is my intended target was the person I shot at. And that's the only *thing* that I know that I can confirm I shot." (emphasis added). When asked whether he would have done anything differently if he was able to relive the night of the shooting, Officer Ortiz unequivocally stated that he would change nothing about his conduct that night and expressed no remorse for the injuries that resulted. Taking the evidence in favor of the jury's verdict, Officer Ortiz also lied about the incident repeatedly, claiming that Michael Williamson pointed a gun at him when he did not and

14

that Michael Williamson was the only one on the porch when he was not. Indeed, although Officer Ortiz could not consistently recall how many people he saw on the porch, where his bullets ended up, or what Michael Williamson was wearing, he was unequivocal in his testimony that he could tell that the gun that Michael Williamson allegedly pointed at him was not in slide-lock. *See Davis v. Rennie*, 264 F.3d 86, 115–16 (1st Cir. 2001) (recognizing that defendants' intentional deception might intensify any need that the jury may have found for punitive damages). On these facts, a reasonable jury could have concluded that Officer Ortiz's conduct was clearly reprehensible. The defendants have accordingly failed to establish any basis for the remittitur of the punitive damages award in this case.

Finally, the defendants ask this Court to grant them a new trial on damages. When a motion for a new trial is based primarily on the excessive nature of the damages, the jury's award may be vacated and a new trial granted only if the verdict is "monstrously excessive" or there is no "rational connection between the evidence on damages and the verdict. *Joan W. v. City of Chicago*, 771 F.2d 1020, 1023 (7th Cir. 1985). As previously set forth, the jury's damages award is entirely rational in light of the evidence at trial, and the defendants' motion for a new trial on damages is therefore denied.

**Conclusion**

For the foregoing reasons, the defendants' combined post-trial motion [231] is denied.

SO ORDERED.

_____
Sharon Johnson Coleman
United States District Court Judge

DATED: 7/9/2018

15